IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No.  07-168 GMS |
| | ) | |
| IBAN JACKSON, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM**

**I.   INTRODUCTION**

On December 13, 2007, the Grand Jury for the District of Delaware indicted Iban Jackson ("Jackson") for possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2). Presently before the court is Jackson's Motion to Suppress Evidence and Statements. The court held an evidentiary hearing in connection with this motion on March 25, 2008. The court subsequently directed the parties to file proposed findings of fact and conclusions of law. After having considered the testimony elicited during the hearing, however, and without the need for further argument, the court concludes that the government did not meet its burden of proving that Jackson consented to the search which yielded the gun. Accordingly, the court will grant Jackson's motion.

**II.   TESTIMONY**

At the evidentiary hearing, the United States called two Wilmington police officers as witnesses: Brian Conkey ("Conkey") and his partner of nine months, Robert Reaves ("Reaves"). Jackson testified on his own behalf and called as a witness Diane Iardella ("Iardella"), a Special Agent with the Bureau of Alcohol, Tobacco, and Firearms (the "ATF"). The following represents the testimony and evidence presented regarding the incident.

### A.     Conkey and Reaves' Testimony Regarding the Incident

On December 3, 2007, at approximately 6:30 p.m., Conkey and Reaves[1] were on patrol[2] in Wilmington, when they observed a gold Buick at 30th and Jefferson Streets. (Transcript of Hearing on Defendant's Motion to Suppress ("Tr.") at 5.) The officers observed the vehicle attempt to make a left turn without signaling, but then "c[o]me back straight," and decided to follow it for one more block. (Id.) The vehicle then made another left onto Harrison Street without signaling. (Id.) At this point, Conkey and Reaves conducted a motor vehicle stop, turning on their dome lights to indicate to the driver that he was going to have to pull over his vehicle. (Id. at 5, 25, 58.) The driver of the vehicle pulled over on North Harrison Street, and Conkey approached the vehicle on the driver's side, while Reaves approached on the rear passenger side. (Id. at 5, 25-26, 42.) The officers could see that there was only one occupant in the vehicle, which both identified as Jackson at the suppression hearing. (Id. at 26.)

Conkey, now at the vehicle, asked Jackson for his license, registration, and insurance, which he provided.[3] (Id. at 6, 26, 42, 58.) Conkey then responded back to his police vehicle to make sure he had a valid license and "that everything checked out." (Id. at 8.) Conkey made a telephone call to the police department's data center and learned from a Progressive insurance agent that the insurance was not valid, because although a policy had been written, the payment fell through. (Tr.

---

[1] At this time, Conkey was a Wilmington police officer for three and one-half years and Reaves was a Wilmington police officer for eighteen months. (Transcript of Hearing on Defendant's Motion to Suppress ("Tr.") at 3-4, 34.)

[2] While on patrol, Conkey and Reaves were riding in a marked police vehicle and both wearing their police uniforms. (Id. at 24-25, 42.)

[3] According to Conkey, Jackson became upset at the request and asked why the officers were stopping him and harassing him. (Id. at 6.) Conkey responded that they were stopping Jackson, because he had failed to signal a few blocks up the street. (Id.)

at 8-9.) At this point, Conkey walked back over to the driver's side of the vehicle Jackson was driving, asked Jackson whether he had any other insurance, and stated that the insurance card provided was no good. (Id. at 9.) According to Conkey, Jackson became very upset and started asking why the officers were bothering and harassing him. (Id. at 9, 42) Conkey explained that he just wanted Jackson's license, registration, and insurance, that it was "just a stop[,]" and that he was "going to give [Jackson] a ticket." (Id. at 9.) Jackson, however, was unable to provide alternative insurance. (Id. at 10.)

After this, Conkey told Jackson that he was "making him very nervous[,]" and asked Jackson to step out of the vehicle for officer safety.[4] (Id. at 10, 27.) Jackson complied and stepped out of the vehicle. (Id. at 10, 27, 42.) Conkey described Jackson as "very tensed up." (Id. at 10.) Conkey then demanded Jackson to go to Reaves for a patdown, to make sure that the officers were safe. (Id.) Conkey had to direct Jackson, who was still tense, to the back of the vehicle. (Id. at 11.) According to Conkey, he used a regular voice, did not curse at or threaten Jackson, and did not draw his firearm. (Id. at 11-12.) Once at the rear of the vehicle, Reaves handcuffed Jackson and patted him down for safety.[5] (Id. at 12, 28.) Reaves did not threaten Jackson, used a calm tone of voice when speaking to him, and did not draw his firearm. (Tr. at 39.)

Conkey then asked Jackson if there was anything in the vehicle that he should know about,

---

[4] Reaves, however, testified that Conkey asked Jackson to step out of the vehicle upon an inventory search. (Tr. at 36.)

[5] Conkey could not recall when Reaves placed Jackson in handcuffs, and did not see Reaves handcuff Jackson. (Id. at 28.) Conkey also did not recall whether Jackson was in handcuffs when he allegedly gave his consent to search the vehicle. (Id. at 32.) Reaves testified that he first asked Jackson to place his hands on the vehicle and spread his legs for the patdown. (Id. at 32.) Jackson became agitated, however, so Reaves advised Jackson that he was not under arrest, but placed him in handcuffs to administer the patdown. (Id. at 36-37, 42.)

to which Jackson replied "no." (Id. at 12.) Conkey next asked Jackson "Do you mind if I check [the vehicle]?" (Id.) Jackson responded, "You [are] going to do what you want to do anyway." (Id.) Conkey explained that he would search the vehicle if Jackson gave him consent. (Id.) According to Conkey, Jackson replied "Go ahead. Do what you got to do."[6] (Id.) Upon hearing Jackson's response, Conkey flashed his flashlight into the driver's side of the vehicle and noticed a handgun beneath the driver's seat with the handle partially exposed. (Id. at 13, 49.) While Conkey was completing his search of the vehicle, Reaves walked Jackson to the police vehicle and asked him to sit inside it. (Id. at 38-39.) Conkey did not inform Reaves that he had received consent to search the vehicle (Tr. at 30), and it appears that Reaves did not hear Jackson consent to the search, although he testified that he heard Jackson say "You're going to do what you do anyway." (Id. at 45.)

      **B.**     **Jackson's Testimony Regarding the Incident**

As previously mentioned, Jackson testified on his own behalf. His testimony was consistent with some aspects of Conkey and Reaves' testimony, but contradicted other aspects. Specifically, Jackson testified that he was stopped on December 3, 2007, at approximately 6:30 p.m., by the Wilmington police. (Tr. at 57.) He was talking with a friend on 30th and Jefferson Streets, as the vehicle approached him and made a left onto 30th Street. (Id.) The police vehicle approached Jackson again and pulled over along the 30th Street Park. (Id.) Jackson finished talking to his friend and pulled onto the street. (Tr. at 57.) He continued along 30th Street after stopping at a stop sign, and the police vehicle began following him. (Id.) Shortly thereafter, the officers signaled for

---

[6] Conkey did not explain to Jackson what would happen if he refused to consent to the search. (Tr. at 33.)

Jackson to pull over, which he did. (Id. at 58.) Jackson asked Conkey whey they stopped him. (Id.) Conkey responded that Jackson had failed to used a turn signal, and asked for his license, registration, and insurance, which Jackson provided. (Id.) Conkey then asked Jackson what he was doing back on 30th and Jefferson Streets. (Id.) Conkey further inquired whether Jackson knew that someone had jut been killed in the area. (Id.) Jackson answered that he was unaware someone had been killed. (Id.)

Conkey took Jackson's documents back to the police vehicle. (Id. at 59.) He returned to Jackson's car about eight to ten minutes later, with Reaves, and, with his hands on his firearm, told Jackson to put his hands up. (Id. at 59, 64.) Jackson complied at first, but then put his hands down, which prompted Conkey to repeat the order to Jackson. (Id.) Conkey then told Jackson to step out of the vehicle. (Id.) When Jackson asked why, Conkey responded that the insurance was not valid. (Id. at 59-60.) After some back and forth conversation regarding why Jackson had to get out of his vehicle, Jackson complied with Conkey's directive. (Id. at 60.) Jackson was taken to the back of his vehicle, handcuffed, and placed into the police vehicle. (Id.) Jackson did not tell Conkey that he could not search the vehicle. (Id. at 65.) However, he also did not tell Conkey that he could search the vehicle. (Id. at 61.) Nor did he sign any document stating that Conkey could search his vehicle. (Id.)

On cross-examination, the government established that Jackson had been arrested numerous times, has been administered Miranda rights before, knows what his Miranda rights are, and knows that he can refuse to deal with the police. (Id. at 61-65.)

    **C.**    **Other Testimony and Evidence Regarding the Incident**

5

Reaves wrote up the police report detailing the incident.[7] (Tr. at 14.) The report states that a firearm was recovered from the defendant's vehicle pursuant to an inventory search. (Id. at 15.) Conkey testified that the statement regarding the inventory search was accurate. (Id.) He further testified, in response to several leading questions from the government, that Jackson gave consent to search as well, that the report did not indicate Jackson consented to a vehicle search, and that, had he reviewed the report, he would have corrected it to include the consent. (Id.) Reaves testified that he wrote the search up as an inventory search, because the officers decided to tow the vehicle when Jackson could not produce valid insurance, and because an officer has to perform an inventory search before any vehicle is towed. (Id. at 41.)

Jackson was interviewed on December 3, 2007. (Id. at 24.) He was administered his Miranda rights, and agreed to give up his right to remain silent. (Id.) Upon questioning, Jackson admitted that he owned the firearm. (Id.)

The Bureau of Alcohol, Tobacco, and Firearms (the "ATF") took control of Jackson's case shortly after his arrest. (Id. at 30.) Special Agent Iardella interviewed Conkey and Reaves regarding the incident on January 24, 2008. (Id. at 53.) According to Iardella's notes, Reaves reported that he did not hear the conversation between Conkey and Jackson, wherein Jackson gave consent to search his vehicle. (Id. at 53-54.) Officer Reaves also reported that Jackson was in the police vehicle when Conkey found the firearm. (Id. at 54.) Iardella recalled that Conkey had said he believed that there had been consent to search Jackson's vehicle. (Id.) Iardella prepared an affidavit of probable cause on December 3, 2007. (Tr. at 54.) Prior to preparing the affidavit,

---

[7] Conkey did not review the report before it was submitted. (Tr. at 14.) He testified that he and Reaves did not review each others reports before submitting them. (Id.)

Iardella spoke with Detective Parrett and Conkey and made some notes of the conversation. (Id. at 55.) Her notes and report regarding the conversation do not mention that Jackson gave consent to search the vehicle. (Id.) Rather, they state that the officers conducted an inventory search of the vehicle. (Id. at 56.)

### III.    DISCUSSION

Jackson has moved to suppress the firearm on the ground that its seizure violates his Fourth Amendment rights. The Fourth Amendment prevents "unreasonable searches and seizures." U.S. Const. amend. IV. As a general rule, the Supreme Court has interpreted the Fourth Amendment's reasonableness requirement to mean that searches must be based on probable cause and executed pursuant to a warrant. *See*, *e.g.*, *Katz v. United States*, 389 U.S. 347, 357 (1967). In the present case, Conkey's search of Jackson's vehicle was not made pursuant to a warrant. As a result, the Government bears the burden of demonstrating that the search was constitutional. *See United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).

The government contends that Jackson consented to Conkey's search of his vehicle. "A search conducted pursuant to valid consent is constitutionally permissible." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). The government bears the burden of proving that Jackson's consent was freely and voluntarily given. *Id.* (citation omitted). The issue of voluntariness is a question of fact to be determined from the totality of the circumstances. *Id.* at 227; *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003). "[T]he critical factors comprising a totality of the circumstances inquiry include the setting in which the consent was obtained, the parties' verbal and non-verbal actions, and the age, intelligence, and educational background of the consenting [party]." *United States v. Wilson*, 413 F.3d 382, 388 (3d Cir. 2005) (quoting *Givan*, 320 F.3d at 459).

The issue at the heart of Jackson's motion is whether Conkey had consent to search the vehicle.[8] In the present case, Conkey testified that he had consent to search the vehicle, while Jackson testified that he did not consent to any search. Thus, in order to make its determination, the court must first assess the credibility of the testifying witnesses.

The court must review the "credibility of the witnesses and the weight to be given the evidence, together with the inferences deductions and conclusions to be drawn from the evidence." *United States v. Williams*, 400 F. Supp. 2d 673, 677-678 (D. Del. 2005) (quoting *United States v. McKeenly*, 6 F.3d 1447, 1453 (10th Cir. 1993) and citing *Gov't of the Virgin Islands v. Gereau*, 502 F.2d 914, 921 (3d Cir. 1974)). As the Third Circuit stated in *Gereau*, "credibility determinations are uniquely the province of the fact-finder[,]" and "may be influenced by factors such as a witness' demeanor, his tone of voice and other matters not subject to appellate scrutiny." 502 F.3d at 921. In the present case, the court's first-hand observations of Conkey and Reaves under oath, including their demeanor, do not establish that their version of the facts is more accurate than Jackson's version. Indeed, when viewing Conkey's and Reaves' testimony alone, or against the other testimony and evidence presented, quite the opposite is true in this case.

In reviewing the Conkey's and Reaves' testimony, the court finds several inconsistencies that lend credence to the fact that the officers viewed the search not as a search pursuant to valid consent, but as an inventory search. First, Conkey testified that he asked Jackson to step out of the vehicle for officer safety, because Jackson was "making him very nervous." (Tr. at 10, 27.) Reaves,

---

[8] Here, the government does not assert that Conkey's search of Jackson's vehicle was a lawful search incident to arrest or an inventory search. Nor does the government, with good reason, advance the theory that the firearm was in plain view. In addition, Jackson does not challenge the legality of the traffic stop. Accordingly, the court confines its analysis to whether Jackson consented to Conkey's search of the vehicle.

however, testified that Conkey asked Jackson to step out of his vehicle in order to conduct an inventory search of it. Conkey further testified that he told Jackson he would search the vehicle only if Jackson gave him consent. Reaves, however, did not hear this part of the conversation, and testified that he walked Jackson to the police vehicle and asked him to sit inside it until after Conkey completed his inventory search. Furthermore, Reaves' own testimony on the consent point is inconsistent. At one point, Reaves testified that he did not hear the conversation between Jackson and Conkey, and did not hear Jackson consent to the search. (Id. at 45.) Yet, in answering the very next question on cross-examination, Reaves testified that he heard Jackson respond to Conkey "You're going to do what you do anyway." (Id.)

When the government handed Conkey a copy of Reaves' police report (Gov. Ex. 2) detailing the incident, he testified that the statement regarding the inventory search was accurate. Conkey later added to his testimony, in response to several leading questions by the government, that Jackson gave consent to search as well, and that he would have corrected the report to include the consent. Reaves also testified that the statements in the report were accurate and that he wrote up the search as an inventory search, because the officers decided to tow the vehicle when Jackson could not produce valid insurance, and because an officer has to perform an inventory search before a vehicle is towed. The foregoing inconsistent testimony, combined with the Conkey's and Reaves' demeanors on the witness stand, indicate to the court that Conkey was less than forthcoming when he testified that he conducted the search pursuant to valid consent.

In addition, Jackson's testimony, Reaves' police report, Iardella's testimony, and the evidence introduced during Iardella's testimony stand in stark contrast to Conkey's and Reaves' testimony. Jackson testified that he did not sign any document stating that Conkey could search his

9

vehicle or tell Conkey that he could search the vehicle. Further, as previously mentioned, Reaves' police report of the incident states that a firearm was recovered from Jackson's vehicle pursuant to an inventory search, not a search pursuant to consent. (See Gov. Ex. 2.) Moreover, Iardella testified regarding her interview of Conkey and Reaves after the incident and, according to her notes, Reaves reported that he did not hear the conversation between Conkey and Jackson, wherein Jackson allegedly gave consent to search his vehicle. Iardella recalled that Conkey, with whom she spoke at least twice, may have said he believed there had been consent to search Jackson's vehicle, but her notes, report, and affidavit of probable cause do not mention that Jackson gave consent to search his vehicle. Instead, they state, consistent with Reaves' police report and consistent with Jackson's testimony that he did not consent to a search, that the officers conducted an inventory search of the vehicle. (See Def. Ex. 1.) Accordingly, because the testimony of Jackson, Conkey, and Reaves is contradictory, and because the record otherwise indicates that the search of Jackson's vehicle was an inventory search, the court finds that the government has not carried its burden of proof on the issue of consent. As a result, the search of Jackson's vehicle violated the Fourth Amendment, and the court will grant Jackson's motion to suppress the firearm and statements made to the police.

Dated: April 7, 2008                                /s/ Gregory M. Sleet
                                                                     CHIEF, UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 07-168 GMS |
| | ) | |
| IBAN JACKSON, | ) | |
| | ) | |
| Defendant. | ) | |

## **ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. The defendant's Motion to Suppress Evidence and Statements (D.I. 19) is GRANTED.


Dated: April 7, 2008                    /s/ Gregory M. Sleet
                                        CHIEF, UNITED STATES DISTRICT JUDGE